# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
July 25, 2023
Lyle W. Cayce
Clerk

No. 22-20321

_____

In the Matter of Bouchard Transportation Company, Incorporated,

*Debtor.*

The Official Committee of Unsecured Creditors,

*Appellant,*

*versus*

Bouchard Transportation Company, Incorporated; Hartree Partners, L.P.,

*Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-2844

_____

Before Higginbotham, Smith, and Engelhardt, *Circuit Judges.*

Jerry E. Smith, *Circuit Judge*:

Bouchard Transportation Company and its affiliates (collectively "Bouchard")—debtors in bankruptcy—prepared to sell some of their assets at an auction. Fearing the auction would go poorly, Bouchard solicited a "stalking horse bidder" to start the auction and set a floor price. In exchange,

No. 22-20321

Bouchard agreed to pay the stalking horse bidder a $3.3 million break-up fee and to reimburse expenses up to $1.5 million. The question is whether those payments were a permissible use of estate funds.

As the bankruptcy and district courts found, the stalking horse payments were lawful under both applicable provisions of the Bankruptcy Code—they provided an actual benefit to the estate and were issued in the reasonable exercise of business judgment. We accordingly affirm.

I.

A.

Bouchard, one of the largest petroleum shipping companies in the United States, filed for Chapter 11 bankruptcy in 2020. The United States Trustee for the Southern District of Texas created the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the unsecured creditors. *See* 11 U.S.C. § 1102(a)(1).

During the bankruptcy, Bouchard went through two rounds of post-petition financing. It first opened a credit facility with Hartree Partners, LP ("Hartree"), but quickly defaulted. It then secured a second round of post-petition financing with JMB Capital Partners Lending, LLC ("JMB"). JMB's loan was secured by a variety of liens on Bouchard's shipping vessels. Using its new funds, Bouchard paid off the outstanding principal, interest, expenses, and fees owed to Hartree. But it still owed around $95 million to JMB (notwithstanding its prepetition debts).

After efforts to jump-start the business failed, Bouchard decided to sell some major assets. The court approved an auction, subject to a number of rules. Importantly, the court's bid-procedures order pre-authorized Bouchard to select a "stalking horse bidder." A stalking horse bidder is an initial bidder whose purchase offer is often negotiated in advance to guarantee a minimum sale price. Because the first bidder in an auction incurs significant

expense (including the cost of due diligence), a stalking horse bidder often haggles for bid protections, such as reimbursement for expenses or a "break-up fee" if it does not win the auction.[1] The bankruptcy court expressly authorized Bouchard to select a stalking horse bidder and to offer that bidder a break-up fee and expense reimbursement.

The selection of a stalking horse bidder was subject to several limitations. Any break-up fee could not exceed 3% of the purchase price, and any expense reimbursement was subject to a cap. If a stalking horse bidder was selected, Bouchard was required to notify the court and disclose the material terms of the deal. And other parties were permitted to object to the stalking horse agreement within three days of the notice. The auction was set for July 19, 2021, but the court required that a stalking horse bidder (if any) be selected by July 7.

Bouchard, however, struggled to generate interest in its vessels. It discussed the possibility of a stalking horse bidder with prospective purchasers, but no agreement was reached by July 7. With the consent of the court, the deadline to select a stalking horse bidder was pushed back to July 11. Yet no agreements materialized. The deadline was delayed again to July 16. Still again, it was pushed back to 11:59 p.m. on July 18, just fifteen hours before the start of the auction.

Finally, after days of negotiations, Bouchard had two sale offers for its vessels: one from Hartree and one from Centerline Logistics ("Centerline"). The board met twice on July 18 to consider the options. Centerline's proposal was initially attractive, but the board had concerns that Centerline

---

[1] See David M. Holliday, Annotation, *Right to Recover Break-Up Fee Arising from Sale of Bankruptcy Estate Property*, 39 A.L.R. Fed. 2d 219 (2009).

would not be able to secure the financing necessary for the transaction. Centerline's bid was also not a stalking horse bid; Centerline wanted Bouchard to cancel the auction and accept its deal outright, which concerned the board. So Bouchard rejected their proposal.

That left Hartree's proposal. Hartree offered $110 million for 29 of the 31 vessels that secured JMB's financing facility. But it demanded a break-up fee of 3% of the purchase price ($3.3 million) and a maximum expense reimbursement of $1.5 million. Those fees would be paid even if Hartree did not submit the winning bid. Lastly, the proposal required any competitor to bid at least $500,000 more than Hartree's offer (plus the value of the bid protections) to be successful.

After discussion, the board agreed to move forward with an auction with Hartree's offer as a stalking horse bid. Around 11 p.m. on July 18, the Bouchard notified the court that Hartree had been selected as a stalking horse bidder. It also disclosed that Hartree had been promised $4.8 million in bid protections as part of the purchase agreement. The Committee was informed of the negotiations and agreement with Hartree, but it filed no objections before the auction.

The auction started the next day. Shortly before it commenced, Bouchard learned that JMB also intended to bid on the vessels. After Hartree submitted its opening bid, Bouchard announced that a second bid would need to be a minimum of $115.3 million—Hartree's bid was $110 million, $4.8 million was owed in bid protections, and the minimum bid increment was $500,000. Then, JMB stated that it would bid exactly $115.3 million. Hartree declined to overbid, and JMB won the auction.[2]

---

[2] In accordance with the court's bid procedures order, Bouchard orally designated Hartree as the backup bidder in case closing negotiations between Bouchard and JMB fell

No. 22-20321

The Committee objected to the break-up fee and expense reimbursement three days later. It contended that the payments were administrative expenses under 11 U.S.C. § 503(b) and that Bouchard had failed to satisfy the statute's strict necessity standard. Bouchard countered that the fees were governed by 11 U.S.C. § 363(b), which allows payments related to an asset sale if they are spent in the reasonable exercise of business judgment.

B.

The bankruptcy court eventually approved the sale of the assets to JMB, but it withheld judgment on the legality of Hartree's bid protections. A few weeks after the auction, the bankruptcy court held a hearing to decide whether it was lawful for Bouchard to designate Hartree as the stalking horse bidder and to give Hartree bid protections. The hearing lasted for five hours, and the court heard testimony from three witnesses: (1) Richard Morgner, a director at Bouchard's investment bank; (2) Patrick Bartels, the independent director of Bouchard; and (3) Scott Levy, a partner at Hartree.

After the hearing, the bankruptcy court gave an oral ruling that the break-up fee and expense reimbursement were permitted, but it capped the expense reimbursement at $1 million (instead of the $1.5 million that Hartree had requested). It reasoned that, regardless of whether 11 U.S.C. § 503(b) or § 363(b) applied, the payments to Hartree were lawful. The court thus ordered payment to Hartree on August 23, 2021.[3]

C.

The Committee appealed the Hartree order, and the district court

---

through. But the Committee disputes that on appeal.

[3] Notably, the court approved Bouchard's Chapter 11 reorganization plan three days later, on August 26, 2021.

affirmed. *Official Comm. of Unsecured Creditors v. Bouchard Transp. Co.* (*In re Bouchard Transp. Co.*), 639 B.R. 697, 702 (S.D. Tex. 2022). As a threshold matter, the court acknowledged that whether the bid protections were lawful was a mixed question of law and fact. *Id.* at 707. But it concluded that it did not matter whether the court employed *de novo* or deferential review. Under either level of review, the bankruptcy court was correct to allow the fees. *Id.*

Like the bankruptcy court, the district court also declined to decide whether 11 U.S.C. § 503(b) or § 363(b) applied, as it found the payment lawful under either provision. *Id.* at 712. If the administrative expense standard applied, the payment was necessary to secure a benefit to the estate—namely, to procure a valuable bid in the asset sale and to force JMB to bid higher than it otherwise would have. *Id.* at 718. If the business judgment rule applied, then Bouchard prevailed for similar reasons. Bouchard reasonably compensated Hartree in exchange for Hartree's serving as the stalking horse bidder. *Id.* at 721.

The Committee appeals again.

## II.

In a bankruptcy appeal, we review the findings and conclusions of the bankruptcy court, not the district court. *See Official Comm. of Unsecured Creditors v. Moeller* (*In re Age Refining, Inc.*), 801 F.3d 530, 538 (5th Cir. 2015). We generally review the bankruptcy court's conclusions of law *de novo* and its factual findings for clear error. *Id.* But the parties contest what level of review applies to the bankruptcy court's order permitting the break-up fee and expense reimbursement.

Whether the payments meet the statutory standard—either § 503(b)

or § 363(b)—is a quintessential "mixed" question of law and fact.[4]  When reviewing a mixed question, we often choose the standard of review that best reflects which "judicial actor is better positioned" to make the decision. *Miller v. Fenton*, 474 U.S. 104, 114 (1985).  That is, if the issue involves the interpretation of legal rules—a skill firmly within the bailiwick of an appellate court—we consider the issue *de novo*.  *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).  But if a dispute would "immerse [the court] in case-specific factual issues—compelling [it] to marshal and weigh evidence, make credibility judgments, and otherwise address . . . multifarious, fleeting, special, narrow facts that utterly resist generalization," we should defer to the court that did the factfinding.  *Id.* (internal quotation marks and citation omitted).

The question in this case is firmly in the latter category.  Whether the break-up fee and expense reimbursement provided an "actual" benefit to Bouchard under § 503(b), or whether the payments were a reasonable exercise of business judgment under § 363(b), are the kind of fact-intensive questions best directed to the bankruptcy court.[5]  Indeed, the bankruptcy court ordered the payment to Hartree only after reviewing considerable record evidence and hearing five hours of witness testimony.  Because the issues

---

[4] *See Pullman–Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982) (noting that mixed questions ask whether "the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated").

[5] The § 503(b) analysis is comparable to the mixed question in *Lakeridge*, 138 S. Ct. at 967–68.  There, the Court reviewed for clear error whether a transaction was conducted at "arm's length."  *Id.* at 969.  Under § 503(b), we ask a similarly fact-bound question: whether a payment provided an "actual" and "necessary" benefit to a debtor in bankruptcy.  Likewise, in *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 603 (5th Cir. 2011), we applied clear-error review when we evaluated the propriety of reimbursements under § 363(b)'s business judgment rule.

are "primarily . . . factual," we review for clear error. *Trendsetter HR L.L.C. v. Zurich Am. Ins. Co.* (*In re Trendsetter HR L.L.C.*), 949 F.3d 905, 910 (5th Cir. 2020) (omission in original) (quoting *Lakeridge*, 138 S. Ct. at 967). We will affirm if the bankruptcy court's determinations are "plausible in light of the record." *Id.* (quotation omitted).

III.

Having settled the standard of review, we now decide whether the contested payments were lawful.

A.

In a Chapter 11 bankruptcy, fees related to the sale of assets are subject to court approval. 2 William L. Norton III, Norton Bankruptcy Law and Practice 3d § 44:28, Westlaw (database updated July 2023). That includes "the payment of bidding incentives to prospective purchasers," such as the break-up fee and expense reimbursement at issue here. *Id.* But there is a split of authority on what substantive standard a judge should use to decide whether such payments are permissible.

Some courts[6]—including the Third Circuit—use 11 U.S.C. § 503(b), under which estate funds can be used for "administrative expenses" if they are "the actual, necessary costs and expenses of preserving the estate." *Id.* § 503(b)(1)(A). "[T]o qualify as an 'actual and necessary cost' . . . a claim against the estate must have arisen post-petition and as a result of actions taken by the [debtor-in-possession] that benefitted the estate."[7]

---

[6] *See, e.g., Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.*), 181 F.3d 527, 532 (3d Cir. 1999); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010).

[7] *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II)*,

Other courts have instead relied on 11 U.S.C. § 363(b)(1), which governs the sale of estate property outside the ordinary course of business.[8] Section 363(b) incorporates the "business judgment standard" from corporate law. *ASARCO*, 650 F.3d at 601. A debtor-in-possession may sell its estate assets while satisfying its fiduciary duties if it gives "some articulated business justification for using, selling, or leasing the property." *Id.* (quotation omitted). That standard is less exacting and gives the debtor more discretion to sell assets (and pay fees) based on merely "sound business reasons." *See Cadle Co. v. Mims* (*In re Moore*), 608 F.3d 253, 263 (5th Cir. 2010).

Unfortunately, *ASARCO*—our leading precedent on the issue—gives mixed signals about which provision applies to these facts. *ASARCO* also dealt with an asset sale in bankruptcy, but the debtor held a two-phase bidding process. After the first round, the debtor asked the court whether it could reimburse certain bidders for due diligence expenses they would incur in the next round of bidding. 650 F.3d at 597–98. The court held that § 363(b) was the governing provision because the debtor sought prospective authorization to reimburse bidders during an asset sale. *Id.* at 602. But it reasoned that § 503(b) would apply to entities that had already "incurred administrative expenses and wish to request payment from the estate." *Id.* at 601.

This case is somewhere between the two situations that *ASARCO* described. On the one hand, this case is also an asset sale, and the debtor

---

931 F.3d 432, 441 (5th Cir. 2019) (quoting *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001)) (first alteration in original).

[8] *See, e.g.*, *ASARCO*, 650 F.3d at 602; *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657 (S.D.N.Y. 1992) (not citing § 363(b) but applying the business judgment rule to a break-up fee arrangement).

sought court approval to reimburse a bidder before the auction began. That is similar to the facts of *ASARCO* and suggests that we should apply § 363(b). On the other hand, the court did not evaluate the specific request for a break-up fee and reimbursement until the after the auction when Hartree—a third party—had already expended resources. Per *ASARCO*, § 503(b) should apply to a backward-looking request for reimbursement.

Because of that uncertainty, both the bankruptcy court and the district court found that the fees were lawful under either § 503(b) or § 363(b). We elect to do the same. This case does not require us to specify which provision of the bankruptcy code governs on these unique facts. Under either standard, the stalking horse payment was legal.

B.

We start with the more stringent provision: § 503(b). As the "claimant seeking administrative expenses," Hartree has the burden of proving that the break-up fee and expense reimbursement arose (1) "post-petition and as a result of actions taken by" Bouchard. *Whistler Energy II*, 931 F.3d at 441 (quoting *Jack/Wade Drilling*, 258 F.3d at 387). Hartree must also prove that the fees were (2) "actual" and (3) "necessary costs and expenses of preserving the estate." *Id.* (quoting § 503(b)(1)(A)). Hartree can satisfy each of those requirements.

1.

As a threshold matter, there was a postpetition agreement between Hartree and Bouchard. That is not a demanding requirement—all that the statute requires is that the expenses were incurred "as a result of actions taken" by the debtor, and that those actions occurred after bankruptcy. *Id.* (quoting *Jack/Wade Drilling*, 258 F.3d at 387). Bouchard signed a purchase agreement with Hartree, stipulating that Hartree would receive a break-up fee and reimbursement even if it was not the winning bidder at auction. And

it is undisputed that the agreement was reached after Bouchard had filed for bankruptcy.

The Committee insists that the Hartree asset purchase agreement was not enforceable until the bankruptcy court approved it, and therefore it was not a valid postpetition transaction. But the Committee reads the "post-petition agreement" requirement too strictly. The focus of the requirement is not so much on the *agreement*, but on its *postpetition* nature. The reason that a § 503(b) administrative expense must arise from a postpetition agreement is that claims for administrative expenses get priority over most other unsecured claims. *See Whistler Energy II*, 931 F.3d at 441–42 (citing 11 U.S.C. § 507(a)(2)). That priority encourages third parties to service the debtors' estate that would otherwise not do so out of fear that they might not get paid. But that incentive "is not required . . . when the relevant obligation pre-dates the bankruptcy." *Id.* at 442.

Therefore, an agreement for services in bankruptcy is enforceable even if the "post-petition business relationship [is] not . . . clearly defined." *Id.* at 442. For example, in *Whistler Energy II*, we upheld the payment of fees under § 503(b) where the debtor requested specific services and a counter-party voluntary performed them, even though there was no formal written agreement. *Id.* at 442–43. Here we have much more than that. Bouchard not only asked Hartree to serve as a stalking horse bidder (a role it dutifully fulfilled), but the parties signed a purchase agreement to that effect.

And although the associated fees were dependent on court approval, that does not affect the postpetition nature of the transaction. Indeed, § 503(b) implicitly contemplates that debtors will incur postpetition administrative expenses before they seek court authorization.[9] It is unsurprising,

---

[9] "An entity may timely *file a request* for payment of an administrative expense,

then, that the Third Circuit assumed that a valid postpetition transaction existed where a contract for break-up fees was contingent on approval by the court. *Calpine*, 181 F.3d at 529, 533.

That is the situation here. Hartree made a deal with a debtor in bankruptcy, carried out its half of the bargain, and now it wants its expenses paid. That is a postpetition transaction covered by § 503(b).

2.

Furthermore, the break-up fee and expense reimbursement provided numerous benefits to the estate. *First*, by securing Hartree's participation as the stalking horse bidder, it helped Bouchard avoid a "naked" auction. When an auction begins with no known bidder, the debtor risks receiving no offers or being forced to sell its assets below market value. As Bouchard's investment banker testified, that concern animated the decision to negotiate with Hartree. With just hours to go before the sale, there was a real risk of a naked auction. By getting Hartree to set a floor price, Bouchard secured value for the estate.

The Committee responds that the risk of a naked auction was overblown. After all, at the same auction, Bouchard sold a different set of vessels to satisfy a pre-petition debt to Wells Fargo and did not use a stalking horse bidder. Those vessels—known as the "Wells Fargo collateral"—still fetched millions. Yet the Wells Fargo auction proves how dangerous a naked auction can be. Although the Wells Fargo collateral eventually sold, it went for approximately $30 million less than was needed to clear the associated debt. Bouchard wanted to avoid a similar scenario in the sale of the larger share of its vessels, so it spent a comparatively small amount of its money to

---

. . . [and] [a]fter notice and a hearing, there shall be *allowed* administrative expenses." 11 U.S.C. § 503(a)–(b) (emphasis added).

guarantee a minimum auction price.

The Committee says that the benefit of an initial bidder proves too much. The very definition of a stalking horse bid is one that sets the floor price at an action. If avoiding a naked auction is a *per se* "benefit" to the estate, then it will always be permissible to pay break-up fees to a stalking horse bidder. But we need not hold that avoiding a "naked" auction is beneficial in every case and at any price. For example, the *O'Brien* court held that offering break-up fees was unnecessary to avoid a naked auction where the bidders had other market incentives to come forward. *See* 181 F.3d at 537.

If there were such evidence here, the analysis would be different. But Bouchard produced evidence that it reached out to over 150 potential bidders, and yet, on the eve of the auction, it had no assurance that anyone would bid on its assets.[10] Because the risk of a poor auction was real, it benefited from Hartree's generous stalking horse bid.

Still, the Committee insists that if the Hartree bid had been successful, it would have been bad for the estate. Although it was a substantial cash infusion, it would not have been enough to pay all of Bouchard's postpetition debts. And because of the nearly $5 million in bid protections, the estate would have been left with an outstanding administrative expense claim that it could not pay. On top of that, the unsecured creditors would receive no relief.

Yet the Committee ignores the fact that, in the absence of the Hartree bid, Bouchard faced the prospect of no viable bidders for most of its vessels. Although the Hartree purchase agreement cost the estate $5 million, that

---

[10] And the only alternative to an auction—the Centerline purchase offer—lacked the requisite financing. The board understandably felt that its best option was proceeding with the auction with Hartree as the stalking horse bidder.

cost is comparable to an insurance policy, under which avoiding a larger risk justifies small premiums. If Bouchard had received no bidders, it would have been far worse for the estate, resulting in paltry recovery for secured creditors and even less for unsecured creditors.

*Second*, the bid protections forced JMB to pay more for Bouchard's vessels than it otherwise would have. To win the auction, JMB had to bid $115.3 million, which added at least $500,000 in value to the estate, over and above Hartree's offer. Bouchard also maintains that selling the assets at that amount was essential to paying off its postpetition debts and confirming its Chapter 11 reorganization plan.

The Committee, however, contends that the bid benefited only JMB and certain senior creditors while providing no recovery for other creditors. But a benefit is still a benefit even if it helps only secured creditors. Although the Committee's loyalty to its interest group is understandable, the fact that JMB's bid helped mainly priority creditors is not a reason to reject the administrative expenses. Unsecured creditors are in the back of the line, and sometimes that comes with downsides.

And again, we are not comparing JMB's bid to a perfect bid that made both the debtors and creditors completely whole. We are comparing JMB's bid to the alternatives: Hartree's stalking horse bid, or no bid for the vessels. The Committee itself contends that the former option was flawed, and JMB's bid was assuredly an improvement on that deal. It was $5.3 million more than Hartree's offer, which, once the $3.3 million break-up fee and $1 million capped expense reimbursement were subtracted, left $1 million for the estate above what Hartree would have provided.

Indeed, if no bidder had come forward for Bouchard's vessels, it may

have doomed Bouchard's chances of a Chapter 11 reorganization plan.[11] Bouchard did not have the money to repay its nearly $100 million in post-petition debts, so a Chapter 11 failure might have kicked the case into Chapter 7 and forced a complete liquidation. *See Koerner v. Colonial Bank* (*In re Koerner*), 800 F.2d 1358, 1360, 1368 (5th Cir. 1986); *see also* 11 U.S.C. § 1112(b)(4)(M).

3.

The last requirement of § 503(b) is that the administrative expenses were "necessary" to secure the claimed benefit. Hartree demonstrated that as well.

For starters, Hartree would not have served as the stalking horse bidder were it not for the break-up fee and expense reimbursement. The Committee speculates that Hartree could not have been induced by the break-up fee because it was contingent on court approval. The evidence in the record, however, suggests that Hartree fully expected it would get court approval. Indeed, the bankruptcy court had already pre-authorized a stalking horse bidder within the limitations in the Hartree purchase agreement.

The Committee points out that the Third Circuit held in *O'Brien* that break-up fees were unnecessary because the parties submitted bids with the full knowledge that the court might not approve a break-up fee. *O'Brien*, 181 F.3d at 537. But there, the court had already declined a break-up fee before the auction. *Id.* at 529. The bidders only hoped that the court would change its mind after the auction.

---

[11] The Committee avers that the Hartree stalking horse bid also did not provide enough money to avoid Chapter 7 conversion. But again, it would have been substantially worse for both the estate and creditors if Bouchard received less money at the auction than Hartree offered.

Here, Hartree had not been previously denied fees. To the contrary, the court's bid procedures order explicitly contemplated break-up fees and reimbursement at the rate Hartree had requested. Furthermore, in *O'Brien*, there were strong incentives for the bidders to bid on the assets in the absence of a break-up fee. *Id.* at 537; *see also Reliant Energy*, 594 F.3d at 206–07 (conducting a similar analysis on similar facts). The Committee has not identified comparable incentives here. That makes it considerably more likely that the break-up fees incentivized Hartree.

The Committee's more persuasive suggestion is that, even if the break-up fee induced Hartree to bid in the first place, it did not induce JMB to top that bid. The Committee claims that "JMB had every incentive to submit a bid in the precise amount it submitted regardless of whether the Hartree Bid was submitted." That is because certain maritime lienholders and administrative expense claimants would get paid out before JMB. So in order for Bouchard to cover those payments plus its $95 million obligation to JMB, it needed a minimum of $115.3 million at the auction, regardless of what Hartree initially bid.

It does appear from the record that Bouchard needed at least $115.3 million to pay senior lienholders, professional fees, and its postpetition financers. The document prepared for Bouchard's board by Kirkland & Ellis suggests as much, and Morgner (Bouchard's investment banker) testified to it in bankruptcy court. If Bouchard got less than $115.3 million, the senior lienholders and professionals would be paid first and JMB would not recover the full amount that Bouchard owed. On the other hand, $115.3 million was the exact amount needed to outbid Hartree and not one penny more. That suggests that JMB bid that number because it was trying to beat Hartree.

Both of those interpretations of the evidence are at least plausible. On clear-error review, there is no reason to reverse the bankruptcy court's fac-

tual finding. If anything, Bouchard and Hartree's theory is slightly more persuasive. Bouchard had no indication that JMB was going to bid on its vessels until Hartree was designated as the stalking horse bidder. And the agreement with Hartree added a $5 million administrative expense claim to the balance sheet that reduced JMB's recovery. Companies tend not to spend an extra $5 million if they do not have to.[12] Thus, Morgner testified that JMB likely would not have bid as highly if it were not for the Hartree stalking horse bid. The bankruptcy court reasonably credited that testimony.

Considering the totality of the evidence, it is "plausible" both that Hartree's stalking horse bid created a benefit for the estate and that Hartree would not have served as the stalking horse bidder without the prospect of fees. It is also plausible that JMB only bid $115.3 million because it was forced to beat out Hartree. Therefore, the break-up fee and the expense reimbursement were "necessary" administrative expenses under § 503(b).

C.

Even if we were to apply § 363(b) instead of § 503(b), the result would be the same. Section 363(b) incorporates the business judgment rule, familiar to corporate law. *ASARCO*, 650 F.3d at 601. If the break-up fee and expense reimbursement were "necessary" to provide a benefit to the estate, then they easily satisfy a deferential reasonableness standard.

The Committee's primary rejoinder is that, even if the agreement was substantively reasonable, Bouchard failed appropriately to consider the con-

---

[12] Indeed, although JMB might not have recovered the full amount of its loan if it bid less than $115.3, any shortfall would have given JMB a deficiency claim against the estate for the difference. In that event, JMB would own the collateral outright and might still recoup all the money after Bouchard liquidated its other assets and paid off the deficiency claim.

17

sequences of the Hartree purchase agreement. Given Bouchard's perilous financial straits, committing almost $5 million to Hartree was no small decision. And Hartree demanded that Bouchard reject certain charter agreements that would have cost Bouchard more money that it did not have. Based on the meeting minutes, it is unclear whether the board ever discussed those shortcomings specifically.

The individuals who were involved in the transaction, however, did not allege that the Hartree agreement was flawless. Instead, they testified to the bankruptcy court that they faced multiple flawed options. Bouchard could proceed with a "naked" auction and risk that a bidder would severely undervalue its vessels. It could accept the Centerline deal, even though the board had reason to doubt Centerline could finance the transaction and Centerline insisted that Bouchard cancel the auction and accept the deal on the spot. Or it could accept Hartree's stalking horse bid, paying more fees and reimbursement costs but guaranteeing a floor price at the auction. Given that trilemma, the stalking horse arrangement was the lesser of multiple evils.

Nor can the Committee seriously contend that Bouchard's leaders violated their fiduciary duty to inform themselves adequately and make a considered decision.[13] The process of finalizing the Hartree deal began on July 16, when Bouchard's board first met to discuss the prospect of Hartree as a stalking horse bidder. According to the minutes, the board thoroughly discussed "the advantages and disadvantages of designating Hartree as the stalking horse bidder" at that time. Bouchard met again on July 17 to discuss the plan. Meanwhile, Bouchard and Hartree exchanged nine drafts of the

---

[13] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("[D]irectors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them."), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

Hartree purchase agreement. Then, on July 18, the board considered a 24-page presentation on the bid. Only after two meetings on July 18 did Bouchard approve Hartree as the stalking horse bidder.

True, as the Committee points out, the July 18 meetings lasted just forty minutes total. But because of the impending auction deadline, everything had to move quickly. To quote the district court, there is "no basis to conclude that the board did not thoroughly review the presentation and make a well-reasoned, careful decision to designate Hartree as the stalking-horse bidder." *Bouchard Transp.*, 639 B.R. at 721.[14] In signing the Hartree purchase agreement, Bouchard acted well within the bounds of reasonable business judgment. Section 363(b) does not require more.

## IV.

Bouchard's payment to the stalking horse bidder is justified under either the stringent administrative-expense standard or the more relaxed business judgment rule. We AFFIRM the district court's judgment affirming the bankruptcy court's order that Bouchard pay Hartree a break-up fee and a capped expense reimbursement.

---

[14] There are also no allegations of self-dealing and the like, which might render a business judgment a breach of fiduciary duty.